PILLSBURY WINTHROP SHAW PITTMAN LLP
RICHARD M. SEGAL (Cal. Bar No. 156975)
richard.segal@pillsburylaw.com
501 W. Broadway, Suite 1100
San Diego, CA 92101-3575
Telephone: (619) 234-5000
Facsimile: (619) 236-1995

PILLSBURY WINTHROP SHAW PITTMAN LLP
ADAM R. HESS (*pro hac vice*)
CATHERINE S. BRANCH (*pro hac vice*)
2300 N Street NW
Washington, DC 20037-1122
Telephone: (202) 663-8000
Facsimile: (202) 663-8007

Attorneys for Plaintiff
CREATIVE NAIL DESIGN, INC.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CREATIVE NAIL DESIGN, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>MYCONE DENTAL SUPPLY CO., INC. d/b/a KEYSTONE RESEARCH & PHARMACEUTICAL,<br><br>Defendant. | Case No. 3:11-cv-01658-LAB-WMC<br><br>**CND'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO KEYSTONE'S MOTION TO DISMISS OR STAY, OR IN THE ALTERNATIVE, TO TRANSFER**<br><br>Honorable Larry Alan Burns<br>Magistrate Judge William McCurine<br>Courtroom: 9<br>Date: October 3, 2011<br>Time: 11:15 a.m. |

# TABLE OF CONTENTS

Page

INTRODUCTION ..... 1

FACTS ..... 2

I. CND FILED THE PRESENT ACTION TO AVOID UNCERTAINTY WITH REGARD TO KEYSTONE'S UNFOUNDED INFRINGEMENT CLAIMS ..... 2

II. KEYSTONE COMMITTED INEQUITABLE CONDUCT BEFORE THE PATENT OFFICE BY FAILING TO DISCLOSE MATERIAL PRIOR ART AND INFORMATION REGARDING INVENTORSHIP OF THE '147 PATENT. ..... 6

A. CND disclosed material prior art to Keystone more than three years before Keystone filed its application for the '147 patent. ..... 6

B. Keystone failed to disclose to the Patent Office CND's material prior art and information regarding inventorship. ..... 8

ARGUMENT ..... 9

I. THIS COURT SHOULD FOLLOW THE FIRST-TO-FILE RULE AND DENY KEYSTONE'S MOTION TO DISMISS OR TRANSFER. ..... 9

A. The first-to-file rule should govern because there is sufficient similarity between the present first-filed case and the case pending in New Jersey. ..... 10

B. The first-to-file rule should govern because CND filed its declaratory judgment complaint to clarify CND's rights as to the '147 patent. ..... 11

C. The first-to-file rule should govern because there are no other factors that warrant disregarding it. ..... 17

II. CND HAS MET THE PLEADING REQUIREMENTS FOR ITS UNENFORCEABILITY CLAIM. ..... 19

CONCLUSION ..... 22

# TABLE OF AUTHORITIES

## Cases

*Alltrade, Inc. v. Uniweld Prods., Inc.*,
946 F.2d 622 (9th Cir. 1991) ..... 9

*Brighton Collectibles v. Coldwater Creek, Inc.*,
2006 WL 4117032, *3 (S.D.Cal. Nov. 21, 2006) ..... 14, 17

*Commodities Future Trading Comm'n v. Savage*,
611 F.2d 270 (9th Cir. 1979) ..... 12

*EEOC Univ. of Pennsylvania*,
850 F.2d 969 (3d Cir. 1988) ..... 9

*Electronics for Imaging, Inc. v. Coyle*,
394 F.3d 1341 (Fed. Cir. 2005) ..... 9, 10, 11, 12, 17

*Everglades Interactive, LLC v. Playdom, Inc.*,
Case No. 1:10-cv-00902 ..... 18

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
575 F.3d 1312 (Fed. Cir. 2009) ..... 20

*Fireman's Fund Ins. Co. v. Ignacio*,
860 F.2d 353 (9th Cir. 1988) ..... 12

*First Fishery Dev. Serv., Inc. v. Lane Labs USA, Inc.*,
No Civ. 97-1069-R, 1997 WL 579165, *1 (S.D.Cal. July 21, 1997) ..... 13, 14, 15

*Genentech v. Eli Lilly & Co.*,
998 F.2d 931 (Fed. Cir. 1993) ..... 9, 10

*ICU Med., Inc. v. Rymed Tech., Inc.*,
No.07-468, 2008 WL 205307, at *4 (D.Del. Jan. 23, 2008) ..... 19

*Kahn v. Gen. Motors Corp.*,
889 F.2d 1078 (Fed. Cir. 1989) ..... 9

*Meints v. Regis Corp.*,
2010 WL 625338, at *2 (S.D. Cal. Feb. 16, 2010) ..... 10

*Schering Corp. v. Amgen, Inc.*,
969 F.Supp. 258 (D.Del. 1997) ..... 19

*Teledyne Techs., Inc. v. Harris Corp.*
No. CV-11-00139-DDP, 2011 WL 2605995 (C.D. Cal. July 1, 2011) ..... 18

*Therasense, Inc. v. Becton, Dickinson and Co.*,
Appeal No. 2008-1511, slip op. at 19 (Fed. Cir. May 25, 2011) ..... 20

*Xoxide, Inc. v. Ford Motor Co.*,
448 F.Supp.2d 1188 (C.D.Cal. 2006) ..... 15, 16

**Statutes and Codes**

United States Code
Title 28, section 2201 .......... 12

**Rules and Regulations**

Federal Rules of Civil Procedure
Rule 12(b)(6) .......... 6

Federal Rules of Civil Procedure
Rule 9(b) .......... 2, 20

Plaintiff Creative Nail Design, Inc. ("CND"), by counsel, respectfully submits this Memorandum in Opposition to Mycone Dental Supply Co., Inc.'s ("Keystone") Motion to Dismiss or Stay, or in the Alternative, to Transfer ("Motion to Dismiss or Transfer").

**INTRODUCTION**

CND, a leading innovator in the nail products industry, is a California corporation with its principal place of business in Vista, California. CND develops, manufactures, and sells nail coating products, including the groundbreaking SHELLAC nail coating system, to nail salons. CND introduced the SHELLAC nail coating system, which includes a Base Coat, Color Coat, and Top Coat, in the first half of 2010. SHELLAC provides a strong, long-lasting nail coating that is easy to remove and does not damage the nail surface. From the moment it was introduced, the SHELLAC nail coating system has been extremely popular. Many of CND's competitors have introduced SHELLAC-like products in an attempt to carve into CND's share of the market, and Keystone manufactures bulk products for some of CND's competitors.

Since March 2011, Keystone has accused CND's SHELLAC nail coating system of infringing Keystone's U.S. Patent No. 5,965,147, entitled "Artificial Fingernails" ("the '147 patent"), and threatened to file suit against CND if CND and Keystone could not resolve their differences. After a prolonged good-faith attempt to settle their differences, CND filed a declaratory judgment complaint in the present case on July 27, 2011, seeking to remove the cloud of uncertainty surrounding its rights regarding the '147 patent. Upon being served with CND's complaint, Keystone filed a complaint of its own in the United States District Court for the District of New Jersey, asserting that CND's SHELLAC nail coating system infringes Keystone's '147 patent. Keystone now seeks to have the present case dismissed, stayed, or transferred to New Jersey, notwithstanding the first-to-file rule.

In its Motion to Dismiss or Stay, or in the Alternative, to Transfer ("Keystone's Motion to Dismiss or Transfer"), Keystone relies on irrelevant case law and disregards several key facts when it argues that the present case should be transferred to New Jersey. When all of the facts are considered, and viewed under appropriate case law, it is clear that this Court should not

disregard the first-to-file rule. Instead, this Court should deny Keystone's Motion to Dismiss or Transfer and honor CND's choice of forum in this first-filed action.

In its Motion, Keystone also asserts that CND's third claim for relief ("Declaration of Unenforceability of the '147 Patent") should be dismissed because CND has not met the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure. While CND disagrees with Keystone's assertion, CND has provided additional support for its claim herein, which undoubtedly meets the heightened Rule 9(b) pleading requirements. Therefore, Keystone's request that CND's unenforceability claim be dismissed should be denied.

## FACTS

### I. CND FILED THE PRESENT ACTION TO AVOID UNCERTAINTY WITH REGARD TO KEYSTONE'S UNFOUNDED INFRINGEMENT CLAIMS.

Keystone first approached CND with allegations that the SHELLAC nail coating system infringed the '147 patent on or about March 3, 3011. *See* Exhibit A to the Declaration of Adam Hess ("Hess Decl.") at ¶ 2. Prior to that time, Keystone and CND had been exploring whether Keystone could become a supplier for one or more of CND's other products. Even after Keystone accused CND of infringing the '147 patent, Keystone and CND continued discussions about Keystone's becoming one of CND's suppliers. *See* Declaration of David Valia ("Valia Decl.") at ¶ 3.

For several months, Keystone and CND discussed whether the SHELLAC nail coating system infringed any claims of the '147 patent, which claims of the '147 patent Keystone believed to be infringed, and a possible licensing agreement through which Keystone would license the '147 patent to CND. For example,

- On April 4, 2011, CND and Keystone had a teleconference to discuss the '147 patent. In this teleconference, Keystone only asserted infringement of claims 6 and 7. *See* Valia Decl. at ¶ 4.
- On April 20, 2011, John Heffner, CND's then-president, met with Cary Robinson, Keystone's president, in California to discuss a number of issues, including Keystone's allegations that CND infringed the '147 patent. *See* Valia Decl. at ¶ 5.
- On April 25, 2011, Larry Steffier, Keystone's Executive Vice President and named inventor on the '147 patent, contacted David Valia, CND's Director of Research and

Development, to set up a time to discuss the alleged infringement of the '147 patent. *See* Valia Decl. at ¶ 5.

- On May 11, 2011, CND and Keystone participated in a second teleconference during which infringement of only claims 6 and 7 of the '147 patent was discussed. During this teleconference, Keystone initially asserted infringement by only the SHELLAC Color Coat. However, when Mr. Valia pointed out that the Color Coat never touches the nail surface, Keystone changed its mind and said that the SHELLAC Base Coat infringed. The SHELLAC Top Coat was never mentioned in this teleconference. Keystone also suggested that the '147 patent infringement issue could be resolved through some type of business arrangement, such as Keystone licensing the '147 patent to CND for $1.00 and becoming a supplier for CND. *See* Valia Decl. at ¶ 6.

- On May 11 and 12, 2011, David Valia and Serene Curry, Keystone's National Sales and Marketing Director, exchanged emails regarding the '147 patent. Keystone apparently now believed that all of the claims of the '147 patent were "in play." CND was surprised by Keystone's new assertion, given that Keystone had previously asserted only claims 6 and 7. *See* Exhibit B to the Hess Decl. at ¶ 3; Valia Decl. at ¶ 7.

- On June 20, 2011, Cary Robinson and Hans Marteau, Executive Vice-President, General Counsel, and Head of Corporate Development of The Colomer Group Participations, S.L.[1], participated in a telephone call to discuss the '147 patent infringement issue and to understand Keystone's terms and rationale for its previously-made suggestion that Keystone would license the '147 patent to CND for $1.00 per year. Mr. Robinson now stated that <u>all of CND's gel-related products</u> infringe the '147 patent and that Keystone is a key supplier to all players in the nail coatings industry except for CND. Mr. Robinson also stated that Keystone would like to do business with CND. *See* Declaration of Hans Marteau ("Marteau Decl.") at ¶ 2.

- On June 21, 2011, Cary Robinson emailed Hans Marteau regarding their June 20 discussion. Mr. Robinson reiterated Keystone's infringement contentions and promised to send a draft license agreement to CND. *See* Exhibit C to the Hess Decl. at ¶ 4.

- On June 27, 2011, Keystone sent a draft license agreement to CND. Its terms were unreasonable and one-sided. Keystone proposed to license the '147 patent to CND for $1.00 a year if CND would, among other things, (1) mark all licensed products and advertisements with a Keystone logo that would be larger than CND's own logo, even though Keystone's other licensees were not doing so, and (2) release Keystone from <u>any claims</u> of infringement of <u>any patent</u> owned by CND, now or in the future, even if the subject matter of any such future patents had not yet been conceived (in other words, a *de facto* license under all of CND's current and future patents). *See* Exhibit D to the Hess Decl. at ¶ 5; Marteau Decl. at ¶ 3.

[1] The Colomer Group Participations, S.L., is the parent company of Colomer U.S.A., Inc., which is in turn the parent company of Roux Laboratories, Inc. Roux Laboratories, Inc. is the parent company of CND.

- On July 6, 2011, CND rejected Keystone's proposal. *See* Exhibit E to the Hess Decl. at ¶ 6.
- On July 14, 2011, Keystone accused CND of infringing "at least one claim" of the '147 patent. Keystone also sent a draft complaint and stated that "Keystone is prepared to delay filing until July 19, 2011 if, and only if, CND is willing to negotiate in good faith toward an amicable resolution. Please let me know by … July 15, 2011 whether settlement discussions will be taking place on Monday, July 18, 2011." *See* Exhibit F to the Hess Decl. at ¶ 7[2]; Marteau Decl. at ¶ 4.
- On July 15, 2011, CND advised Keystone that CND was willing to talk on July 18, 2011. *See* Exhibit G to the Hess Decl. at ¶ 8; Marteau Decl. at ¶ 4.
- On July 18, 2011, CND and Keystone held a telephone conference to discuss the '147 patent, Keystone's draft complaint, and CND's comments to Keystone's draft license agreement. *See* Marteau Decl. at ¶ 4.
- On July 19, 2011, Keystone suggested additional changes to the draft license agreement. *See* Exhibit H to the Hess Decl. at ¶ 9. Although CND still could not ascertain exactly what Keystone wanted from CND, CND suggested that the parties meet in person. *See* Exhibit I to the Hess Decl. at ¶ 10; Marteau Decl. at ¶ 5.
- On July 26, CND and Keystone met in New York. CND approached this meeting with a genuine interest in finding a solution to the '147 patent issues. However, Despite CND's best efforts, CND and Keystone could not come to an agreement. *See* Marteau Decl. at ¶ 6-8.

In the midst of these infringement discussions and discussions concerning Keystone possibly doing business with CND, Keystone raised yet another issue. Keystone claimed that it had developed "the next generation of a Shellac type product" and offered to provide CND with information regarding this "super SHELLAC" if CND entered into a non-disclosure agreement with Keystone. *See* Exhibit C to the Hess Decl. at ¶ 4; Exhibit J to the Hess Decl. at ¶ 11; Marteau Decl. at ¶ 7. During the July 26 meeting in New York, CND indicated that it did not foresee any ability for the parties to work together on CND's existing SHELLAC nail coating system due to pre-existing business relationships, but expressed an interest in having discussions about "super SHELLAC." CND believed that the patent issues concerning the SHELLAC nail

---

[2] Exhibit B to CND's Complaint inadvertently included Keystone's July 19, 2011 email (Exhibit H to the Hess Decl. at ¶ 9), instead of Keystone's July 14, 2011 email (Exhibit F to the Hess Decl. at ¶ 7).

coating system (both Keystone's infringement allegations and enforcement of CND's patents) should be addressed separately from any discussions relating to "super SHELLAC." CND also believed that any negotiations related to "super SHELLAC" should be between equals, and not with Keystone attempting to exert unreasonable leverage over CND with the baseless '147 patent infringement issues. *See* Marteau Decl. at ¶ 7.

After the July 26 meeting in New York, CND realized that any further negotiations regarding the alleged infringement of the '147 patent would be pointless. Keystone's proposals for resolving the '147 patent infringement issue were unrealistic and a moving target. CND could never be sure what Keystone really wanted, and it became apparent that this uncertainty as to whether Keystone would ever retract or pursue its patent infringement claims was creating a clouded and unacceptable business position for CND, and the issue could not be resolved without litigation. *See* Marteau Decl. at ¶ 8. Therefore, on July 27, 2011, CND filed its declaratory judgment complaint in the present case, asking this Court for a declaration of its rights as to the '147 patent. *See* CND's Declaratory Judgment Complaint, Dkt. No. 1. Keystone was served the next day. *See* Marteau Decl. at ¶ 9.

As for the "super SHELLAC" issue, CND was willing to continue to discuss this project with Keystone, even after filing suit. *See* Marteau Decl. at ¶ 9. CND saw "super SHELLAC" and the present case as two separate issues, and explained as much to Keystone. CND explained that it believed very strongly in the merits of its defenses against Keystone's accusations of infringement of the '147 patent, and that it would not have discussions about "super SHELLAC" intertwined with the issues surrounding the '147 patent. *See* Marteau Decl. at ¶ 7-9.

Keystone, however, declined to have further discussions regarding "super SHELLAC" (*see* Exhibit K to the Hess Decl. at ¶ 12) and rushed to file its complaint in New Jersey after being served with CND's California complaint. *See* Exhibit L to the Hess Decl. at ¶ 13. In its complaint, Keystone named not only CND, but also three of CND's distributors, each of which do business in New Jersey. Keystone did not, however, assert any independent infringement allegations against CND's distributors. Keystone merely asserted that their distribution of CND's

SHELLAC nail coating system infringed the '147 patent. Keystone also added several New Jersey state law claims and a Lanham Act claim, all of which are derived from Keystone's patent infringement claims.

On August 18, 2011, Keystone filed the instant Motion to Dismiss or Transfer in the present case, arguing that, notwithstanding the first-to-file rule, the present case should be dismissed, stayed, or transferred to the District of New Jersey.

On September 7, 2011, CND and the other Defendants in the New Jersey case responded to Keystone's Complaint, filing a Motion to Dismiss four out of the five counts under Rule 12(b)(6) (*see* Exhibit M to the Hess Decl. at ¶ 14), as well as a Motion to Dismiss or Transfer the New Jersey case to the Southern District of California, based on the first-to-file rule. *See* Exhibit N to the Hess Decl. at ¶ 15. Keystone's responses to these motions are due on September 19, 2011.

## II. KEYSTONE COMMITTED INEQUITABLE CONDUCT BEFORE THE PATENT OFFICE BY FAILING TO DISCLOSE MATERIAL PRIOR ART AND INFORMATION REGARDING INVENTORSHIP OF THE '147 PATENT.

### A. CND disclosed material prior art to Keystone more than three years before Keystone filed its application for the '147 patent.

At least as early as 1993 or 1994, Keystone approached CND about doing business with Keystone by becoming a "second source" supplier for CND's then-existing products. *See* Declaration of Douglas Schoon ("Schoon Decl.") at ¶ 2. At some point during these discussions, Keystone stated that it had noticed a "patent pending" marking on RADICAL, one of CND's nail care products, and inquired about the subject matter of CND's pending patent application. Keystone alleged that it wanted to know more about the patent application to avoid infringing CND's forthcoming patent. *See* Schoon Decl. at ¶ 3.

Keystone and CND met several times during this time period. At one particular meeting that occurred soon after RADICAL's introduction, the parties met in Irvine, California to discuss two issues: Keystone's desire to do business with CND and Keystone's desire for more information about CND's patent application. In attendance at that meeting were Cary Robinson (Keystone's president), Larry Steffier (Keystone's head scientist and the sole named inventor on

the '147 patent), Jim Nordstrom (CND's then-president), and Douglas Schoon (CND's Director of Research and Design). Although CND declined to show the application to Keystone, Mr. Schoon described the application's contents and the RADICAL product, which he developed. *See* Schoon Decl. at ¶¶ 4, 5.

RADICAL, which CND introduced in 1993, is a liquid artificial nail product. It was developed to be an improvement over TURBO, one of CND's earlier artificial nail products. Both RADICAL and TURBO had excellent adhesive properties, primarily due to the fact that they included a monomer known as hydroxyethyl methacrylate ("HEMA"). RADICAL also included improvements that provided better workability, color stability, and reduced odor. *See* Schoon Decl. at ¶¶ 6, 7.

CND shared all of this information regarding RADICAL with Keystone at the meeting in Irvine, California, more than three years before Keystone filed the application for the '147 patent. Mr. Schoon explained to Keystone that HEMA could improve the adhesive properties of a primer or, as was the case with RADICAL, it could be added directly to the monomer blend to provide excellent adhesive properties without the use of an additional primer. In other words, not only did HEMA improve the adhesion of nail care products that contained HEMA, it also improved the adhesion of other nail care products applied on top of a coating that contained HEMA. Mr. Schoon also explained the chemical mechanism by which HEMA provided improved adhesion to the natural nail plate and how RADICAL was developed from TURBO and another CND product known as SOLAR NAIL. *See* Schoon Decl. at ¶¶ 8-10.

By 1996, more than a year before Keystone filed the application for the '147 patent, CND stopped using HEMA and began using another monomer known as hydroxypropyl methacrylate ("HPMA") in its RADICAL formulation. CND found that using HPMA provided the same adhesive qualities as HEMA, but reduced skin irritation. *See* Schoon Decl. at ¶ 11.

Although CND and Keystone continued their discussions after the meeting in Irvine, California, CND ultimately chose not to do business with Keystone. *See* Schoon Decl. at ¶ 12.

**B. Keystone failed to disclose to the Patent Office CND's material prior art and information regarding inventorship.**

On December 3, 1997, Keystone filed the application for the '147 patent, which lists Larry Steffier as the sole inventor. *See* Exhibit O to the Hess Decl. at ¶ 16; *see also* '147 patent, Exhibit A to CND's Declaratory Judgment Complaint, Dkt. No. 1. Claim 1 is representative of the subject matter disclosed and claimed in the application:

> A pretreatment composition for increasing the adhesion of adhesives and coatings to proteinaceous substrates comprising a liquid substantially acid-free hydrophilic acrylate monomer composition.

*See id.* (emphasis added). Examples of the claimed "substantially acid-free hydrophilic acrylate monomers" in the patent application include both HEMA and HPMA. *See id.* Indeed, the examples in the '147 patent specifically list HEMA as a preferred substantially acid-free hydrophilic acrylate monomer. *See id.*

In the first Office Action, the examiner rejected all proposed claims in view of several prior art patents. *See* Exhibit P to the Hess Decl. at ¶ 17, at 3. In response to the examiner's Office Action, Keystone's attorney argued that use of the claimed hydrophilic acrylate monomers as treating compositions was novel. *See* Exhibit Q to the Hess Decl. at ¶ 18, at 3-4. Keystone distinguished its invention from the prior art by pointing out that the cited prior art included hydrophilic acrylate and methacrylate polymers, but that Keystone's invention used hydrophilic monomers. *See id.* at 4. According to Keystone, no one had ever used these hydrophilic monomers as treating compositions for improving adhesion of adhesives and coatings. *See id.*

Based on Keystone's arguments that the use of hydrophilic monomers in treating compositions was novel, the examiner permitted the '147 patent to issue. *See* Exhibit R to the Hess Decl. at ¶ 19, at 2 ("The following is an examiner's statement of reasons for allowance: The prior art does not teach a pretreatment composition for increasing the adhesion of adhesives and coatings to proteinaceous substrates comprising a liquid substantially acid-free hydrophilic acrylate monomer composition.") (emphasis added).

Keystone, however, did not disclose to the Patent Office any information about CND's use of HEMA (*i.e.*, "a liquid substantially acid-free hydrophilic acrylate monomer") in RADICAL at least three years before Keystone filed the application for the '147 patent. Specifically, Keystone failed to disclose that CND was using HEMA in RADICAL for the purpose of improving adhesive qualities and that CND had provided information concerning HEMA to Keystone, including Larry Steffier, well before the filing of the application for the '147 patent. Keystone's failure to disclose this information caused the Patent Office to allow the '147 patent to issue. Had Keystone disclosed this information to the Patent Office, the '147 patent would never have issued.

**ARGUMENT**

**I. THIS COURT SHOULD FOLLOW THE FIRST-TO-FILE RULE AND DENY KEYSTONE'S MOTION TO DISMISS OR TRANSFER.**

This Court should deny Keystone's Motion to Dismiss or Transfer the present case to the United States District Court for the District of New Jersey. The Southern District of California is the appropriate forum for this case because (1) CND filed its action in California first, before Keystone filed its action in New Jersey, (2) California is an appropriate and more convenient forum, and (3) this case is centered on events occurring in California.

The starting point for analyzing any motion to transfer that disregards the first-to-file rule is recognizing that the rule is just that – the rule, not the exception. The first-to-file rule was developed to promote efficiency and should not be disregarded lightly. *Alltrade, Inc. v. Uniweld Prods., Inc.*, 946 F.2d 622, 625 (9th Cir. 1991); *see also EEOC Univ. of Pennsylvania*, 850 F.2d 969, 977 (3d Cir. 1988). Absent special circumstances, the first suit should have priority. *Kahn v. Gen. Motors Corp.*, 889 F.2d 1078, 1081 (Fed. Cir. 1989).

The first-to-file rule is applied "unless considerations of judicial and litigant economy, and the just and effective disposition of disputes, requires otherwise." *Electronics for Imaging, Inc. v. Coyle*, 394 F.3d 1341, 1347 (Fed. Cir. 2005) (setting forth the rule in first-to-file patent cases) (quoting *Genentech v. Eli Lilly & Co.*, 998 F.2d 931, 938 (Fed. Cir. 1993)).

> While it is true that a district court may consider whether a party intended to preempt another's infringement suit when ruling on the dismissal of a declaratory action, ... , we have endorsed that as merely one factor in the analysis. Other factors include 'the convenience and availability of the witnesses, or absence of jurisdiction over all necessary or desirable parties, or the possibility of consolidation with related litigation, or considerations relating to the real party in interest.

*Electronics for Imaging*, 394 F.3d at 1347-48 (quoting *Genentech*, 998 F.2d at 938).

Because none of these factors favor a transfer, the Court should follow the first-to-file rule and deny Keystone's Motion to Dismiss or Transfer.

**A. The first-to-file rule should govern because there is sufficient similarity between the present first-filed case and the case pending in New Jersey.**

For the first-to-file rule to apply, the parties and subject matter of the two cases must be sufficiently similar. *E.g.*, *Meints v. Regis Corp.*, 2010 WL 625338, at *2 (S.D. Cal. Feb. 16, 2010). The parties and issues do not need to be identical; only sufficient similarity is required. The present case and the case pending in New Jersey meet this requirement. Each case involves the same Keystone patent and the same accused CND product. The minor differences (additional distributor Defendants and ancillary claims in the New Jersey case) all flow from the same accused infringing activity, and should not affect where the case is heard.

Most importantly, CND is the true target in the New Jersey case, and Keystone had no reason to include any distributors as Defendants, other than as an obvious ploy to force CND to litigate in New Jersey. Keystone has alleged no acts of infringement by the distributor Defendants other than their distribution of CND's SHELLAC nail coating system. Indeed, recognizing that California is the proper venue for hearing this case, all Defendants in the New Jersey case have requested that the New Jersey case be transferred to the Southern District of California to be joined with the present case.

Similarly, Keystone's ancillary claims in the New Jersey case do not affect whether the cases are sufficiently similar. Keystone's ancillary claims each have their basis in whether CND has infringed the '147 patent, which is the primary issue in the present case. For example,

- To support Count II, Keystone states that "CND's statements in marketing the SHELLAC products to the public (set forth in detail above in paragraphs 50-52 [sic 49-51[3]] and incorporated by reference herein), violate the Lanham Act because they are literally and/or impliedly false, misleading and likely to cause confusion." *See* Exhibit L to the Hess Decl. at ¶ 13, at ¶ 70. In paragraph 49, for example, Keystone asserts that because SHELLAC infringes the '147 patent, any statements made by CND regarding SHELLAC's unique characteristics must also be false.

- To support Count III, Keystone incorporates the paragraphs that set forth the specific allegations of Count II (*i.e.*, CND's statements in marketing the Shellac nail coating system are false, misleading, and likely to cause confusion). *See id.* at ¶ 75. As with Count II, Keystone relies on the CND's alleged infringement of the '147 patent to support its assertion that CND has made false statements.

- To support Count IV, Keystone states that "Defendants have engaged in unfair competition by misappropriation and use of the invention embodied in the '147 patent and making false marketing claims related to its SHELLAC product as described herein." *See id.* at ¶ 81.

- To support Count V, Keystone states that "Defendants have been unjustly enriched … due to its wrongful acts complained of herein [*e.g.*, patent infringement]." *See id.* at ¶ 86.

As such, Keystone's ancillary claims will rise and fall with the alleged infringement of the '147 patent, which is the subject matter of the CND's first-filed complaint in the present case, and there is sufficient similarity between the two cases. To the extent Keystone argues that the present case should be transferred because the cases are not similar, the Court should deny Keystone's Motion to Dismiss or Transfer.

**B. The first-to-file rule should govern because CND filed its declaratory judgment complaint to clarify CND's rights as to the '147 patent.**

Adherence to the first-to-file rule is the rule, not the exception. *Electronics for Imaging*, 394 F.3d at 1347. Only under certain circumstances is departure from the first-to-file rule warranted, such as anticipatory pleading, the convenience and availability of the witnesses, or absence of jurisdiction over all necessary or desirable parties, or the possibility of consolidation

---

[3] Keystone's Complaint includes several errors in paragraph numbering. In this instance, Keystone appears to have intended to refer to paragraphs 49 through 51, not paragraphs 50 through 52. Paragraphs 49 through 51 describe CND's allegedly false statements, whereas paragraph 52 is the first paragraph in a section about Defendants' alleged patent infringement.

with related litigation, or considerations relating to the real party in interest. *Id.* Keystone bears the burden of showing that special circumstances, such as the ones listed above, should bar the first-to-file rule's application. *See, e.g., Commodities Future Trading Comm'n v. Savage*, 611 F.2d 270, 279 (9th Cir. 1979). Because Keystone cannot do so, the first-to-file rule should apply, and the Court should deny Keystone's Motion to Dismiss or Transfer.

In its Motion to Dismiss or Transfer, Keystone primarily focuses on only one circumstance that may lead the Court to disregard the first-to-file rule. Keystone argues that CND filed its complaint in the present case "in anticipation" of Keystone's "imminent suit" in New Jersey. Keystone's arguments, however, are groundless. [4] Keystone makes two necessary assumptions in support of its arguments, neither of which are true: that Keystone's New Jersey case was imminent and that CND filed its declaratory judgment complaint in anticipation of that case.

First, Keystone was not planning to file its case in New Jersey, and would not have done so, but for the fact that CND filed the present case. Indeed, in its Motion to Dismiss or Transfer, Keystone did not argue that it would have filed the complaint in the present action, had CND not filed its declaratory judgment complaint in California first. In addition, Keystone's president, Cary Robinson, admitted as much to Hans Marteau during a July 28, 2011 telephone conversation. Mr. Robinson stated that he had not wanted to pursue litigation and had hoped to eventually resolve the parties' differences through further negotiation. *See* Marteau Decl. at ¶ 9. Mr. Robinson reiterated his position in a follow-up email to Mr. Marteau, stating that he had

[4] Keystone's arguments also seem to call into question the jurisdictional and venue basis for all declaratory judgment actions. 28 U.S.C. § 2201 explicitly permits declaratory judgment actions when an actual and justiciable controversy exists between the parties which is of sufficient immediacy and reality to warrant declaratory relief. The purpose of 28 U.S.C. § 2201 is to provide the opportunity to clarify rights and legal relationships without waiting for an adversary to file suit, and the uncertainty as to whether a party may file suit confers sufficient immediacy and reality to warrant the filing of a declaratory judgment complaint. *See Fireman's Fund Ins. Co. v. Ignacio*, 860 F.2d 353, 354 (9th Cir. 1988). Keystone's arguments, however, seem to imply that once a patentee threatens a lawsuit, an accused infringer has no right to pursue a declaratory judgment action on its own terms, and that any declaratory judgment action must be in the same jurisdiction set forth in the patentee's draft complaint. Under Keystone's arguments, a patentee can lock down a particular venue, as insurance, without being required to actually file a complaint. Not only is this unfair, it is not the law.

expected to continue negotiations and had hoped to resolve the differences between the parties in a non-litigation setting. *See* Exhibit K to the Hess Decl. at ¶ 12. Further, Keystone's draft complaint shows that Keystone's filing of the New Jersey case was not imminent. Keystone's complaint was not in its final form when Keystone sent a draft copy to CND on July 14, and Keystone had not even settled on which defendants it would target. Keystone's draft complaint included a CND distributor located in Norcross, Georgia as a defendant, but that distributor was not included in Keystone's as-filed complaint. *See* Exhibit F to the Hess Decl. at ¶ 7. Thus, although Keystone had prepared a draft complaint as a negotiation tactic in an attempt to strong-arm CND into accepting an unreasonable settlement or gain a better negotiating position regarding "super SHELLAC," Keystone was not planning to file the New Jersey complaint when CND filed its complaint here in California.[5]

Second, CND did not expect Keystone to file the New Jersey complaint, and therefore did not file its case in anticipation of the New Jersey case. Rather, CND expected that, had CND not filed the present declaratory judgment case, Keystone would drag out negotiations indefinitely, trying to use its unfounded infringement allegations as leverage to obtain business from CND. Keystone would continue to present a changing target, raising numerous issues such as doing business with CND, the '147 patent, and "super SHELLAC," while making unreasonable proposals that CND could never accept. As such, CND's uncertainty regarding its rights as to the '147 patent would drag on forever, creating a clouded and unacceptable business position.

The cases cited by Keystone in support of its Motion to Dismiss or Transfer do not apply to the present case. Keystone relies heavily on *First Fishery Dev. Serv., Inc. v. Lane Labs USA, Inc.* and *Xoxide, Inc. v. Ford Motor Co.* to support its assertion that the present case should be transferred to New Jersey, notwithstanding the first-to-file rule. Neither of these cases, however, are patent cases.

---

[5] Mis-numbered paragraphs and incorrect cross-references in Keystone's Complaint also show that Keystone was not prepared to file to the present case and rushed to finalize its Complaint only after being served with CND's first-filed complaint.

In non-patent first-to-file cases such as the ones relied on by Keystone, Ninth Circuit courts have held that "a suit is anticipatory for purposes of allowing a court to treat it as an exception to the first to file rule if the plaintiff in the first-filed action filed suit on receipt of specific, concrete indications that a suit by the defendant was imminent." *Brighton Collectibles v. Coldwater Creek, Inc.*, 2006 WL 4117032, *3 (S.D.Cal. Nov. 21, 2006). In patent cases like the present case, however, an anticipatory filing is not enough to overcome the first-to-file rule. In patent cases, "[a] district court may not deviate from the first-to-file rule solely because the first-filed claim was anticipatory of the later-filed claim." *Id.* at fn. 2. Thus, Keystone must show not only that CND filed its declaratory judgment complaint in the present case in anticipation of Keystone's imminent suit in New Jersey (which CND did not do), but also that other factors weigh in favor of transfer. Keystone has not met its burden. Indeed, Keystone's Motion to Dismiss or Transfer does not even address this point.

However, even if the non-patent-case standard set forth by the Ninth Circuit applied to the present case, the cases cited by Keystone are inapposite. For example, in *First Fishery* , the defendant in a declaratory judgment false advertising case sent a letter to the plaintiff, demanding that the plaintiff stop disseminating false information about the defendant's products. *First Fishery Dev. Serv., Inc.* , No Civ. 97-1069-R, 1997 WL 579165, *1 (S.D.Cal. July 21, 1997). The defendant also included a draft complaint and stated in its letter that if the parties could not reach an agreement by June 5, 1997, the defendant would file the complaint on June 6. *Id.* The day after the defendant sent its letter and draft complaint, the plaintiff filed a declaratory judgment action. *Id.*

Keystone equates *First Fishery* to this case. The facts, however, are quite different. In *First Fishery*, the defendant set forth a firm and specific date by which it would file suit if the parties could not come to an agreement, and the plaintiff responded by immediately filing a declaratory judgment action. The *First Fishery* plaintiff

> knew with utter certainty that Defendant would file its suit on June 6, 1997, a mere two days after Plaintiff filed for declaratory relief. Thus, Plaintiff did not need relief from the uncertainty engendered

> by a party who continually threatened litigation, but delayed in bringing suit.

*Id.* at *3 (emphasis added). In contrast, although Keystone sent to CND a draft complaint and a date by which it would allegedly file suit if no agreement was reached, Keystone and CND continued to negotiate after that date. Additionally, unlike the plaintiff in *First Fishery*, CND genuinely tried to resolve the dispute with Keystone without resorting to litigation. *See* Marteau Decl. at ¶ 6. CND representatives traveled to New York to meet with Keystone and tried, in good faith, to reach an agreement through a variety of possible solutions, including a license under the '147 patent and other business arrangements. *See* Marteau Decl. at ¶ 6-7. It was not until later that it became apparent to CND that the parties had reached an impasse on the '147 patent infringement issue, but that Keystone apparently preferred to have a cloud hanging over CND's head indefinitely. *See* Marteau Decl. at ¶ 8. Thus, litigation was the only way for CND to achieve certainty.

"Uncertainty that warrants declaratory relief generally relates to whether the Plaintiff might be sued." *First Fishery*, 1997 WL 579165 at *3. This was the case here. Keystone was sending CND mixed signals, and Keystone's changing demands left CND unsure as to Keystone's specific infringement allegations and whether Keystone would ever pursue or abandon its infringement claims against CND. By filing its declaratory judgment complaint in California, CND ultimately decided to end that uncertainty.

Keystone's reliance on *Xoxide, Inc. v. Ford Motor Co.* is similarly misplaced. In *Xoxide*, Ford sent a cease and desist letter explaining that Xoxide was violating Ford's trademark rights. *Xoxide*, *Inc. v. Ford Motor Co.*, 448 F.Supp.2d 1188, 1189 (C.D.C. 2006). The parties exchanged several letters, including one from Ford stating that if Xoxide did not stop using Ford's trademarks by a certain date, Ford would commence litigation. *Id.* at 1190. While the parties were still in discussions, but after Ford's deadline, Xoxide secretly initiated a declaratory judgment action against Ford. *Id.* at 1191. Xoxide then spent almost a month continuing settlement discussions before serving the complaint, which Xoxide's counsel characterized "as insurance" against Ford's suing Xoxide. *Id.* at 1191-1192.

Keystone places great weight on the fact that Xoxide sued Ford "before a settlement could be concluded." *See* Keystone's Motion to Dismiss or Transfer, at 11. That fact, however, was not one that swayed the *Xoxide* court:

> Ford attempted to minimize needless litigation and resolve the dispute amicably by negotiating a resolution outside of litigation. Xoxide responded by secretly filing a lawsuit in Los Angeles while giving the impression that it was making its best efforts to negotiate a settlement of the dispute. That undisclosed lawsuit remained unserved while Xoxide pretended to continue negotiations with Ford in a good faith attempt to resolve the dispute short of litigation. When Ford was finally informed that Xoxide had filed suit, Xoxide's counsel ... indicated that the lawsuit was "insurance in case Ford decided to sue [Xoxide] in Michigan ... a forum of its choosing.

*Xoxide,* 448 F.Supp.2d 1188 at 1194 (emphasis added). By waiting to serve its suit for almost a month after filing, Xoxide was clearly using the declaratory judgment action as insurance in the event negotiations did not conclude in Xoxide's favor, not as a means to resolve unacceptable uncertainty.

In contrast, CND served Keystone as soon as CND filed the present case. CND did not attempt to hide anything or continue negotiations regarding the alleged '147 patent infringement after filing its declaratory judgment complaint. To the extent CND attempted to have further discussions with Keystone, those discussions related solely to the separate issue of whether to pursue a project relating to "super SHELLAC."

Finally, in its Motion to Dismiss or Transfer, Keystone also attempts to argue that CND acted in bad faith by alleging that "CND actively induced Keystone's delay in filing the New Jersey action by continuing its settlement discussions with Keystone at the same time" CND filed its declaratory judgment complaint. Motion to Dismiss or Transfer, at 11. Keystone's arguments, however, are completely unfounded and disparage the significant effort CND made to resolve the issues regarding the '147 patent, including meeting with Keystone in person and CND's willingness to consider alternative business proposals. *See* Marteau Decl. at ¶¶ 6-9. Despite CND's best efforts, CND realized that the parties could not come to an agreement, and CND filed

the California case to remove the uncertainty surrounding the '147 patent. *See* Marteau Decl. at ¶ 8. After filing the California action, CND stopped discussions regarding the '147 patent and immediately served the California complaint on Keystone. While Keystone may not like that CND filed the California case, the fact that CND did so is not evidence that CND was negotiating in bad faith.

Keystone has not met its burden of showing that any special circumstances exist to warrant disregarding the first-to-file rule. Therefore, the Court should deny Keystone's Motion to Dismiss or Transfer.

**C. The first-to-file rule should govern because there are no other factors that warrant disregarding it.**

Even if this Court finds that CND's declaratory judgment complaint was filed in anticipation of Keystone's New Jersey action, "a district court may not deviate from the first-to-file rule <u>solely</u> because the first-filed claim was anticipatory of the later-filed claim." *Brighton Collectibles*, 2006 WL 4117032 at *3, f. 2 (emphasis added). Instead, in patent cases like this one, courts must consider not only whether the first-filed claim is anticipatory, but also the convenience and availability of the witnesses, the absence of jurisdiction over all necessary or desirable parties, the possibility of consolidation with related litigation, and considerations relating to the real party in interest. *See Electronics for Imaging*, 394 F.3d at 1347-48.

Most of these factors either do not apply in the present case or do not weigh in favor of one venue over the other. For example, although New Jersey might be more convenient for Keystone and its witnesses, California is more convenient for CND and its witnesses. For example, CND's headquarters are located in Vista, California. The SHELLAC nail coating system was developed in Vista, and all SHELLAC-related marketing activities are based in Vista. Finally, the developer of the aforementioned prior art RADICAL nail care product, Doug Schoon, who will be an important witness in the present case, is located in California.

There has been no suggestion that witnesses will be available in one forum, but not the other.[6] Similarly, although it may be more convenient for Keystone to produce records in New Jersey (and CND to produce records in California), there is no reason that the parties' records cannot be made available in either forum. *See Everglades Interactive, LLC v. Playdom, Inc.*, Case No. 1:10-cv-00902, Order Denying Defendants' Motion to Transfer, at ¶ 15 (D.Del. June 8, 2011) (finding that the convenience factor for both documents and witnesses is "outdated, irrelevant, and should be given little weight").[7]

This Court has jurisdiction over the parties in the present case, and will have jurisdiction over all of the parties in the New Jersey case, should it be joined to the present case. By filing its declaratory judgment complaint, CND assented to having this case heard here. Similarly, Keystone has assented to personal jurisdiction in this District by not challenging jurisdiction or venue in its Motion to Dismiss or Transfer. Finally, the other Defendants in the New Jersey case filed a Motion to Transfer in the New Jersey case, asking the New Jersey case to be transferred to this Court, and will waive any jurisdictional or venue issues.

Both the Southern District of California and the District of New Jersey are equally capable of handling this case, and there is no question that all of the issues raised by CND in its declaratory judgment complaint, and by Keystone in its New Jersey complaint, can be resolved by this Court. Keystone cannot dispute that fact, and Keystone has not argued that this Court is incapable of resolving any of the issues raised in either complaint. Neither forum will have any issue enforcing a judgment against the parties, and the fora are equally congested. The average time to trial in New Jersey in civil cases is 33.6 months, and the average time to trial for civil

---

[6] Keystone admits as much on page 15 of its Motion to Dismiss or Transfer.

[7] To the extent Keystone relies on *Teledyne Techs., Inc. v. Harris Corp.*, No. CV-11-00139-DDP, 2011 WL 2605995 (C.D. Cal. July 1, 2011), to support its Motion to Dismiss or Transfer, such reliance is misplaced. Keystone conveniently omits that a major factor in the *Teledyne* court's decision to dismiss the first-filed case was that "the interests of expediency and efficiency militate against proceeding" with the first-filed case because the court in which the second case was filed – and the judge who was handling the case – had already issued claim construction rulings on three of the four patents at issue in another case and was therefore quite familiar with the patents. *Teledyne Techs.*, 2011 WL at *2.

cases in the Southern District of California is 34.5 months. *See* 2010 Annual Report of the Director of Judicial Business of the United States Court at Table C-5. In addition, neither the Southern District of California nor the District of New Jersey has a particular local interest in hearing this case. Patent infringement lawsuits are matters of national concern and do not implicate the public polices of one forum over the other. *See, e.g., Schering Corp. v. Amgen, Inc.*, 969 F.Supp. 258, 269 (D.Del. 1997); *ICU Med., Inc. v. Rymed Tech., Inc.*, No.07-468, 2008 WL 205307, at *4 (D.Del. Jan. 23, 2008).

Finally, it is important to note CND is Keystone's true target, and the real parties in interest in this case are currently before this Court. The distributors named in the New Jersey case were named solely because they distribute CND's nail coating system therein, and Keystone did not assert any independent infringement allegations against CND's distributors.

Simply put, there is no reason to transfer the present case to New Jersey. As discussed above, the first-to-file rule is the rule, not the exception. Keystone has not shown, and indeed, cannot show, that there is any reason to disregard CND's choice to have this case heard in California. The alleged infringing activity originated in California, where CND developed the accused SHELLAC nail coating system and where CND's accused marketing activities are based. *See* Valia Decl. at ¶ 2. Keystone's accusations were directed to CND in California, and any harm caused by Keystone's accusations would be predominantly felt by CND in California. *See* Exhibit A to the Hess Decl. at ¶ 2. As such, there can be no dispute that the present claims arose in California.

Because there are no factors that weigh in favor of transfer, there is no reason for the Court to disregard the first-to-file rule. Therefore, the Court should deny Keystone's Motion to Dismiss or Transfer.

## II. CND HAS MET THE PLEADING REQUIREMENTS FOR ITS UNENFORCEABILITY CLAIM.

In its Motion to Dismiss or Transfer, Keystone asks the Court to dismiss CND's third claim for relief, which alleges that the '147 patent is unenforceable because Keystone committed inequitable conduct when it failed to disclose to the Patent Office material prior art and

information regarding inventorship. Keystone argues that CND has not met the pleading requirements set forth in Rule 9(b) of the Federal Rules of Civil Procedure. While CND disagrees with Keystone's assertion, CND is providing herein additional support for its claim, which surely meets the Rule 9(b) pleading requirements.[8]

Keystone, like all patent applicants, owed a duty of candor to the Patent Office. Keystone committed inequitable conduct when it breached this duty by failing to disclose material information regarding the patentability of the '147 patent claims. Keystone's inequitable conduct before the Patent Office renders the '147 patent unenforceable. *See Therasense, Inc. v. Becton, Dickinson and Co.*, Appeal No. 2008-1511, slip op. at 19 (Fed. Cir. May 25, 2011).

Inequitable conduct before the Patent Office must be pled with particularity under Rule 9(b) of the Federal Rules of Civil Procedure. *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1326 (Fed. Cir. 2009). Under *Exergen*, a satisfactory inequitable conduct pleading in patent cases must include "identification of the specific who, what, when, where, and how of the material misrepresentation or omission committed before the [Patent Office]." *Id.* at 1327. Each of these facts are set forth above and explained below:

Douglas Schoon met with ***Cary Robinson***, Keystone's president, and ***Larry Steffier***, the sole named inventor on the '147 patent, ***in the 1993-1994 timeframe in Irvine, California***, approximately three years before the application for the '147 patent was filed. In that meeting, Mr. Schoon explained that ***CND's RADICAL product contained HEMA***, which is identified as ***a "liquid substantially acid-free hydrophilic acrylate monomer" in the '147 patent***. Mr. Schoon also explained that ***HEMA was included in the formulation to increase adhesion***, and Mr. Schoon explained ***the chemical mechanism by which HEMA increased adhesion***. The application for the '147 patent was filed on December 3, 1997, and the Patent Office's prosecution history of the '147 patent (*i.e.*, the official Patent Office record of proceedings related

---

[8] If the Court so desires, CND will voluntarily amend the Third Claim for Relief in its Complaint to specifically include the additional facts cited herein.

to the '147 patent) indicates that ***neither Mr. Robinson nor Mr. Steffier nor Keystone's attorney provided this information to the Patent Office***.

It is unquestionable that ***this information is material to the patentability of all claims in the '147 patent***. For example, independent claim 1 recites:

> A pretreatment composition for increasing the adhesion of adhesives and coatings to proteinaceous substances comprising a liquid substantially acid-free hydrophilic acrylate monomer composition.

All claims of the '147 either depend on independent claim 1, or claim methods relating to the composition described in independent claim 1, and include the limitation of a "substantially acid-free hydrophilic acrylate monomer composition."

During prosecution of the application for the '147 patent, Keystone's attorney argued that the claims were allowable because the prior art cited by the examiner included acid-free hydrophilic methacrylate polymer compositions, but the application claims recited the use of acid-free hydrophilic acrylate monomer compositions as pretreatment compositions. *See* Exhibit Q to the Hess Decl. at ¶ 18. Based on that argument, the examiner allowed the claims. *See* Exhibit R to the Hess Decl. at ¶ 19. However, had Keystone disclosed to the Patent Office that CND's TURBO and RADICAL products included acid-free hydrophilic acrylate monomer compositions to increase adhesion for several years before Keystone filed the application for the '147 patent, the '147 patent would not have issued. In other words, ***the information CND provided to Keystone***, including information relating to CND's commercial products, ***directly contradicts the arguments presented by Keystone's attorney during the prosecution of the '147 patent***, and ***the examiner would have not allowed the claims if she had been aware of that information***.

In view of the fact that (a) CND and Keystone are competing in the same business, (b) CND chose not to do business with Keystone, and (c) the withheld information directly contradicts arguments made by Keystone during prosecution of the application for the '147 patent, there can be no doubt that ***Keystone failed to disclose to the Patent Office the information CND provided to Keystone with the intent to deceive the Patent Office***. Therefore,

CND respectfully requests that the Court deny Keystone's request to dismiss CND's claim of unenforceability.

## CONCLUSION

For the reasons stated above, CND respectfully requests that the Court DENY Keystone's Motion to Dismiss or Transfer.

Dated: September 19, 2011

PILLSBURY WINTHROP SHAW PITTMAN LLP

By /s/ Richard M. Segal

RICHARD M. SEGAL
richard.segal@pillsburylaw.com
501 W. Broadway, Suite 1100
San Diego, CA 92101-3575
Telephone: (619) 234-5000
Facsimile: (619) 236-1995

ADAM R. HESS
CATHERINE S. BRANCH
2300 N Street NW
Washington, DC 20037-1122
Telephone: (202) 663-8000
Facsimile: (202) 663-8007

Attorneys for Plaintiff
CREATIVE NAIL DESIGN, INC.